**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

RICHARD DEEDS                                )
and SANDRA DEEDS                       )
                                                         )            3:07-cv-00060-ECR-VPC
              Plaintiffs,                         )
                                                         )
       vs.                                            )            **REPORT AND RECOMMENDATION**
                                                         )            **OF U.S. MAGISTRATE JUDGE**
                                                         )
DONALD HELLING, *et al*.,               )
                                                         )            February 19, 2009
              Defendants.                        )
_____)

       This Report and Recommendation is made to the Honorable Edward C. Reed, Jr., United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.  Before the court are plaintiffs' motion for summary judgment re: suspension of visitation (#71) and defendants' motion for summary judgment (#84).  Defendants opposed plaintiffs' motion (#83) and plaintiffs replied (#96).  Plaintiffs opposed defendants' motion (#104) and defendants replied (#96).  The court has thoroughly reviewed the record and the motions and recommends that defendants' motion for summary judgment (#84) be granted, and plaintiffs' motion for summary judgment re: suspension of visitation (#71) be denied.

**I.  HISTORY & PROCEDURAL BACKGROUND**

       Richard Deeds and Sandra Deeds (collectively "plaintiffs") filed their amended complaint on August 17, 2007. Richard Deeds ("Mr. Deeds") is a *pro se* inmate currently incarcerated at Northern Nevada Correctional Center ("NNCC") in the custody of the Nevada Department of Corrections ("NDOC"), and Sandra Deeds ("Ms. Deeds") is a former NDOC employee (#26). They are married. *Id*. On November 1, 2007, the court ordered that this action was to proceed as to: "(a) the substantive due process claim regarding the suspension of visitation privileges against defendant Helling; (b) the retaliation claim against defendant Helling; (c) the deprivation of personal property claim against defendants Peabody and Helling." The court dismissed all other

claims (#32, p. 3-4). Plaintiffs and defendants each filed competing motions for summary judgment (#71 and #84). Plaintiffs' motion requests summary judgment only with regard to their visitation allegations, and does not discuss either their retaliation claim or deprivation of personal property claim (#71). However, both plaintiffs and defendants raise the same arguments in their own motion for summary judgment and in their opposition to each other's motion for summary judgment. Each incorporates their motion or opposition by reference.[1] Therefore, both plaintiffs' motion and defendants' motion will be discussed here.

The court notes that plaintiffs are proceeding *pro se*. "In civil cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II. DISCUSSION & ANALYSIS

### A.    Discussion

#### 1.    Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©.  In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence

---

[1]In their opposition to plaintiffs' motion for summary judgment, defendants "incorporate by reference the Statement of Pertinent Undisputed Facts from Defendants' Motion for Summary Judgment, filed concurrently with this Opposition" (#83). Defendants also note that all exhibit citation reference in the opposition is to the exhibits attached to their motion for summary judgment. *Id*. In plaintiffs' opposition to defendants' motion for summary judgment, they incorporate by reference the exhibits attached to their motion for summary judgment (#104).

1

regarding such issues of judgment to allow him to prevail on the
merits, he cannot prevail at the summary judgment stage.

2

*Beard v. Banks*, 548 U.S. 521, 526, 126 S.Ct. 2572, 2576 (2006).  Where reasonable minds could

3

differ on the material facts at issue, however, summary judgment should not be granted.

4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

5

The moving party bears the burden of informing the court of the basis for its motion, and

6

submitting evidence which demonstrates the absence of any genuine issue of material fact.

7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden,

8

the party opposing the motion may not rest upon mere allegations or denials in the pleadings but

9

must set forth specific facts showing that there exists a genuine issue for trial.  *Anderson*, 477

10

U.S. at 248.  Rule 56(c) mandates the entry of summary judgment, after adequate time for

11

discovery, against a party who fails to make a showing sufficient to establish the existence of an

12

element essential to that party's case, and on which that party will bear the burden of proof at

13

trial.  *Celotex*, 477 U.S. at 322-23.

14

**B.**      **Analysis**

15

**1.**      **Counts I, III, and IV - Denial of Visitation**

16

In counts I, III, and IV, plaintiffs assert that defendant Helling violated their Fourteenth

17

Amendment substantive due process rights because he permanently suspended their visitation

18

rights in a manner "which was clearly arbitrary and unreasonable with no substantial relationship

19

to a legitimate concern" (#26, p. 4). Plaintiffs claim that they have a state-conferred liberty

20

interest in continued visitation. *Id*. p. 7-8.

21

The facts underlying this case began in 2001. Ms. Deeds was employed as a nurse at

22

NNCC until September 19, 2000 (#104, exh. p. 215). Presumably, she met and developed an

23

acquaintance with Mr. Deeds during her employment. It is unclear when the Deedes developed

24

a romantic relationship, but they corresponded by mail since at least September 26, 2000 (#84,

25

exh. 1G). Ms. Deeds (then Sweeney) submitted an application for visitation with Mr. Deeds on

26

January 25, 2001. *Id*., exh. 1I. Former Warden David Meligan denied her application on February

27

28

3

2, 2001, stating that the denial was due to the fact that Ms. Deeds was a "former NDOP employee."*Id*. exh. 1J. Ms. Deeds appealed this denial to former director of the NDOC, Jackie Crawford. *Id*. exh. 1K. Director Crawford denied her appeal, explaining that "former NDOP employees must be recommended for visitation by the Warden of the facility, with this recommendation forwarded to me for approval. Both Warden Meligan and the Assistant Director of Operations have denied your visiting privileges and I uphold their decisions." *Id*. ex. 1O.

Ms. Deeds applied for visitation privileges a second time on February 21, 2001. *Id*. exh. 1L. Warden Meligan denied this application on February 23, 2001, again citing her former employment at NNCC. *Id*. exh. 1M and 1N. Director Crawford also denied Ms. Deeds's request, stating that Warden Meligan's decision to deny visitation was final. *Id*. exh. 1Q. Mr. Deeds filed an application for visitation on June 21, 2001. This application was again denied with the reason for denial stated as "per Director Crawford, this visitor remains <u>denied</u>. An application will not be mailed out at this time." *Id*. exh. 1R. During this application process, the Deedes married at NNCC on May 9, 2001. *Id*. exh. 1P. Although it is unclear if either Mr. or Ms. Deeds filed another visitation application, Warden David Meligan granted Ms. Deeds's request to visit on July 27, 2001. He informed her that she should contact the NNCC visiting officer for visitation regulations and a schedule. He also forwarded his approval letter to Director Crawford. *Id*. exh. 1S. Warden Meligan did not inform plaintiffs that they were required to take any further action, and it is unclear whether Director Crawford ever followed up and sent a letter confirming the approval of visitation. However, Mr. Deeds's visitation log notes that Ms. Deeds was approved for visitation "per AG office 7/27/01." *Id*. exh. 1T. Therefore, the court presumes that someone in the Warden's office or the Director's office discussed the decision to grant visitation to Ms. Deeds with the Office of the Attorney General. Mr. Deeds's visitation log also shows that Ms. Deeds visited Mr. Deeds fifty-six times between August 6, 2001 and April 20, 2006, with the majority of visits taking place in 2001 and 2002. *Id*.

Defendant Helling suspended Ms. Deeds's visiting privileges with Mr. Deeds on May 23, 2006. His letter reads in full: "Effective immediately your visiting privileges with your husband Mr. Deeds NDOC #14946 are suspended due to your past employment with the Department of

Corrections. An error occurred allowing you to visit. Any concerns or questions should be forwarded to this office." *Id*, exh. 1V. Defendants state that Defendant Helling, "as the new Warden of NNCC," was not informed that Ms. Deeds was a former employee until May 23, 2006, when Aurelia Ewing, Administrative Assistant II, told him, and this knowledge compelled him to suspend Ms. Deeds's visitation privileges. *Id*. p. 4, exh. 1U.

In discovery responses, Defendant Helling states that prior to making the decision to suspend Ms. Deeds's visits, he contacted Director Whorton and explained that the error of allowing Ms. Deeds to visit "occurred due to the fact that [Mr. and Ms. Deeds] had not visited for a lengthy period of time and visiting staff were not aware of [the policy of not allowing former NDOC or NDOP staff to visit inmates], i.e. an oversight occurred by allowing these visits to happen." *Id*. exh. 1U. Director Whorton agreed that further visiting would not be allowed "regardless of previous visits." *Id*. In other discovery responses, defendant Helling states that he decided to suspend Ms. Deeds's visiting privileges because of "the compromise of staff occurred during her employment (#104, exh. p. 12). Additionally, defendant Helling states that "it was common knowledge among staff and inmates that Ms. Deeds was a former employee." *Id.* exh. p. 19. Defendants do not explain the apparent discrepancy between their contentions that defendant Helling and visiting staff were unaware that Ms. Deeds was a former employee until May 23, 2006, but that it was common knowledge among staff that Ms. Deeds was a former employee.

Ms. Deeds wrote to defendant Helling on June 5, 2006, expressing her concern that her visiting privileges had been suspended on the basis of her former employment (#71, exh. p. 11). She wrote: "My employment with the State of Nevada ended in June 2000. I married Richard in May 2001. Per Warden Melligan (sic), per NRS regulations, I was not permitted to visit for a year after my employment terminated. I was granted visiting privileges in August 2001." *Id*. Defendant Helling responded to this letter on June 8, 2006, stating that the "Nevada Department of Corrections policy is not to allow former employees to visit incarcerated persons. NNCC is enforcing this policy....An error was made in allowing these visits to occur..." (#84, exh. 1Y). Additionally, Director Whorton responded to Ms. Deeds's inquiry on July 6, 2006, informing her

1    that the "Nevada Department of Corrections has a problem with former employees who have

2    developed relationships with inmates causing serious security and safety concerns with this

3    department. This very fact of allowing visits can and has encouraged inmates to compromise staff.

4    This is evident of escape, resulting in violent crimes from NNCC in the last year." *Id*. exh. 1BB.

5    In response to an inmate request form (#71, exh. p. 9), Defendant Helling also sent a

6    memorandum to Mr. Deeds on June 2, 2006, which stated in full: "The Department's policy is

7    not to allow ex-employees to visit an inmate. This policy is being enforced in your case" (#84,

8    exh. 1W). Plaintiffs' visiting privileges have not been reinstated since they were revoked in May

9    2006. Plaintiffs commenced the instant action on February 6, 2007, alleging that the suspension

10    of their visiting privileges violates their substantive due process rights under the Fourteenth

11    Amendment (#1, #26).

12       Defendants contend they are entitled to summary judgment on plaintiffs' substantive due

13    process claim regarding the suspension of visitation because plaintiffs have no constitutional

14    liberty interest in visitation (#84, p. 8-9; #83, p. 4-5). Further, defendants' decision to suspend

15    visitation was reasonably related to legitimate penological objectives. *Id*. Finally, defendant

16    Helling is entitled to qualified immunity. *Id*.

17       Plaintiffs acknowledge that the Constitution does not itself create a right to visitation (#71,

18    p. 9). However, their position is that they have a state-created liberty interest in continued

19    visitation. They argue that NDOC officials granted them visitation privileges based on

20    Administrative Regulation ("AR") 719, and that this regulation, along with Nev. Rev. Stat. §

21    209.423, created a liberty interest which prohibited defendants from suspending visitation without

22    complying with the confines of AR 719. *Id*. p. 10. Additionally, "even in the absence of such a

23    liberty interest...a permanent withdrawal of visitation, or one applied arbitrarily to a particular

24    inmate, would warrant relief." *Id*., *citing Overton v. Bazzetta*, 539 U.S. 130, 137 (2003). Plaintiffs

25    claim that defendant Helling acted arbitrarily because he "singled them out" in withdrawing their

26    visitation privileges (#104, p. 7). Plaintiffs also assert that they are entitled to strict scrutiny

27    because the right to marry is involved. *Id.* Finally, defendant Helling is not entitled to qualified

28    immunity because plaintiffs "retained protection against arbitrary state action" and "the Nevada

inmate disciplinary process has been previously ruled to create a liberty interest" (#71 p. 11-12).

Defendants reply that plaintiffs have no right to visitation and that the regulation that controls their rights is constitutional (#83, p. 4-5). Additionally, plaintiffs are not entitled to strict scrutiny. *Id.* p. 6.  Defendants set out some of the applicable sections of AR 719 and IP 7.14 to argue that visiting is a privilege and that the warden has the right to suspend visitation at any time. *Id.* p. 7. Defendants also contend that plaintiffs' visiting privileges were never "properly approved" because they "never received the necessary approval of the Director as required by [AR 719]." *Id.* p. 9. Finally, defendants apply the *Turner* test to the policy disallowing visitation between an inmate and a former employee, stating that the "suspension of visitation between an inmate and a former employee spouse as provided in AR 719 and IP 7.14 is reasonably related to legitimate penological concerns. *Id.* p. 10, #96, p. 5-10.

### (a)      AR 719 and IP 7.14

AR 719 governs an inmate's rights to visitation (AR 719, #84, exh. 1A). The AR begins by stating that "visitation is a privilege for inmates assigned to the Department of Prisons." *Id.* The AR allows visitation restriction to be "governed by institutional space and personnel resources and [to] be imposed to prevent injuries to persons, to maintain the safety and security of the institution, and to prevent the introduction of items or substances which inmates are not permitted to possess." *Id.*  The AR sets out a procedure for former employees to request visitation with inmates. It states:

> Former employees of the Nevada Department of Prisons may request visiting privileges with an inmate on an individual basis. The request will be submitted to the Warden/designee for initial consideration and then to the Office of the Director for final approval based upon the recommendation of the Warden/designee.

*Id.*

AR 719 also sets out the procedure for terminating and suspending visitation. *Id.* "Visiting privileges may be suspended upon orders from the Warden/designee. A notice should be given to both the inmate and visitor of the reasons for the suspension" *Id.* The AR also gives specific reason why visiting privileges may be suspended for "up to six months." The reasons all relate to visitor or inmate misconduct (inebriation, violation of rules, uncontrolled children,

unacceptable physical conduct). *Id*. Additionally, "visiting privileges that have been terminated indefinitely due to the seriousness of the offense, i.e. introduction of contraband, should be reviewed every six (6) months for re-consideration by the Warden at the written request of the visitor." *Id*. Any suspension of visitation "shall be documented for inclusion in the inmate's institutional file...[and] shall clearly explain the reason for the action, the length of time the action will apply, the circumstances under which the action will be reconsidered, and instructions for appealing the action taken." *Id*.

IP 7.14 provides "specific information and guidelines to inmates partaking in visiting that is unique to NNCC" (NNCC IP 7.14, #84, exh. 1B). With regard to visitation by former employees, IP 7.14 includes the same language as AR 719, plus one final sentence: "All other approval processes must be complete prior to the last review step." *Id*. The IP also includes language on suspension. It states:

> 4. The Warden or designee may suspend visiting privileges. This is generally done because of a disciplinary situation with the inmate or if adverse information is received on a visitor already on the approved visiting list. A visitor's visiting privileges may be suspended without formal discipline of the inmate, i.e. the visitor is found to be at fault.
>
> 5. When a decision is made to suspend visiting privileges, a notice shall be given to both the inmate and the subject visitor, stating that reasons for suspension of visiting. An inmate may appeal through the established inmate grievance system.

*Id*.

### (b) Case Law

The issue here is whether Mr. Deeds has any constitutionally protected interest in visitation, whether contact or noncontact, with a particular person, namely, Ms. Deeds. This case does not involve the denial of all visitation, as Mr. Deeds does not claim that he has been denied visitation with other people. The Ninth Circuit law regarding a prisoner's right to visitation is not fully developed. It is clear that the Due Process Clause does not directly guarantee prisoners a right to unfettered visitation. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). However, the Supreme Court has held that "state law may create enforceable liberty interests in the prison setting." *Id*. at 461. In *Thompson*, the Court held that "the use of 'explicitly

1   mandatory language,' in connection with the establishment of 'specified substantive predicates'

2   to limit discretion, forces a conclusion that the State has created a liberty interest." *Id.* at 463,

3   *quoting Hewitt v. Helms*, 459 U.S. 460, 472 (1983).

4          However, in *Sandin v. Connor*, the Supreme Court abandoned "the *Hewitt* approach,"

5   stating that it has led "to the involvement of federal courts in the day-to-day management of

6   prisons, often squandering judicial resources with little offsetting benefit to anyone." 515 U.S.

7   472, 482 (1995). The Court instead decided to follow the test it had previously set out in *Wolff*

8   *v. McDonnell*, 418 U.S. 539 (1974), which narrowed the scope of when a state law creates a

9   liberty interest. The Court stated:

10               Following *Wolff*, we recognize that States may under certain
                 circumstances create liberty interests which are protected by the Due
11               Process Clause. But these interests will be generally limited to freedom
                 from restraint which, while not exceeding the sentence in such an
12               unexpected manner as to give rise to protection by the Due Process
                 Clause of its own force, nonetheless imposes atypical and significant
13               hardship on the inmate in relation to the ordinary incidents of prison life.

14   *Sandin*, 515 U.S. at 483-84 (internal citations omitted).

15          Subsequently, in *Overton v. Bazzetta*, the Supreme Court stated that "[t]he very object of

16   imprisonment is confinement.  Many liberties and privileges enjoyed by other citizens must be

17   surrendered by the prisoner.  An inmate does not retain rights inconsistent with proper

18   incarceration.  And, as our cases have established, freedom of association is among the rights least

19   compatible with incarceration." 539 U.S. 126, 131 (2003) (citations omitted). Although the Court

20   in *Overton* found that not all rights to intimate association are terminated by incarceration, courts

21   will uphold visitation restrictions which "bear a rational relation to legitimate penological

22   interests."  *Id.* at 132; *see also Doe v. Tandeske*, 361 F.3d 594 (9th Cir. 2004). If a prison

23   regulation "impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

24   related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). The court

25   is to review four factors to the reasonableness of a regulation. *Id.* "First, there must be a 'valid,

26   rational connection' between the prison regulation and the legitimate governmental interest put

27   forward to justify it." *Id.* at 90. Second,  the court must determine "whether there are alternative

28   means of exercising the right that remain open to prison inmates." *Id.* Third, the court must

9

1    consider "the impact accommodation of the asserted constitutional right will have on guards and

2    other inmates, and on the allocation of prison resources generally." *Id*. Fourth, "the absence of

3    ready alternatives is evidence of the reasonableness of a prison regulation." *Id*.

4         The Ninth Circuit has held that prisoners do not have a right to contact visitation. *Barnett*

5    *v. Centoni*, 31 F.3d 813 (9ᵗʰ Cir. 1994). Additionally, "the loss of the right to intimate associate

6    is simply part and parcel of being imprisoned for conviction of a crime...[as] [i]ncarceration is

7    simply inconsistent with the vast majority of concomitants to marriage, privacy, and personal

8    intimacy." *Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002). The court in *Gerber* found that

9    prisoners do not have a constitutional right to contact visits or conjugal visits, nor do they have

10   the right to procreate. *Id*. at 622-23. The court stated that "while the intangible and emotional

11   aspects of marriage survive incarceration, the physical aspects do not." *Id*. at 623.

12             **(c)**           **Analysis**

13        As an initial matter, plaintiffs do not have a right to strict scrutiny. The court has

14   previously found plaintiffs' right to marry is not at issue in this case because plaintiffs are already

15   married (#27, p. 5, fn 3).

16        As there is very little Ninth Circuit law discussing a prisoner's right to visitation,

17   defendants cite to two cases from the Eleventh Circuit and from the Northern District of Ohio.

18   In *Caraballo-Sandoval v. Honsted*, a case very similar to this one, prison officials suspended an

19   inmate's visitation privileges with his wife, who had previously been employed by the prison as

20   a "career resource coordinator." The Eleventh Circuit granted summary judgment for the

21   defendants based on qualified immunity. The court stated that "inmates do not have an absolute

22   right to visitation, such privileges being subject to the prison authorities' discretion provided that

23   the visitation policies meet legitimate penological objectives. We believe that the concerns that

24   former prison employees visiting inmates may pose a threat to security because of their

25   knowledge of security procedures constitutes a legitimate penological objective." 35 F.3d 521,

26   525 (11ᵗʰ Cir. 1994). In *Blair v. Loomis*, the district court for the Northern District of Ohio found

27   that a state statute did not create a liberty interest in visitation because "the types of liberty

28   interests created by states are 'generally limited to freedom from restraint....[or that which]

1   imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of

2   prison life.'" 1 F.Supp.2d 769, 772 (N.D. Ohio 1998), *quoting Sandin*, 515 U.S. at 430.

3       Other courts have also found that visitation regulations do not create liberty interests. *See*

4   *Ware v. Morrison*, 276 F.3d 385 (8th Cir. 2002) (holding that a prisoner has no constitutionally

5   protected interest implicated by the suspension of his visitation privileges because the suspension

6   of visitation did not impose an atypical and significant hardship); *Lynott v. Henderson*, 610 F.2d

7   340 (5th Cir. 1980) (holding that limitations on visitation may be imposed if they are necessary

8   to meet legitimate penological objectives); *Billups v. Galassi*, 202 F.3d 272 (7th Cir. 2000)

9   (holding that the denial of visitation with a specific visitor is not an atypical and significant

10  hardship).

11      Based on the cases discussed above, the court agrees that plaintiffs do not have a liberty

12  interest in visitation. These cases create a standard that prison regulations only create a liberty

13  interests in actions that impose an "atypical and significant hardship on [an] inmate in relation to

14  the ordinary incidents of prison life." Given that the Supreme Court's examples of atypical and

15  significant hardships were freedom from restraint and the involuntary administration of

16  psychotropic drugs, the courts above have all found that visitation regulations do not create a

17  liberty interest that is protected by the Constitution. Therefore, AR 719 does not confer plaintiffs

18  a state-created liberty interest.

19      The court notes that defendants do not recite AR 719 in its entirety. They ignore the

20  provisions which state visiting privileges are normally only suspended for punitive reasons or for

21  violations of visitation rules.  Defendants also do not explain how the "error" occurred allowing

22  Ms. Deeds to visit. Plaintiffs complied with the application process to the extent that they could.

23  The Director received a copy of Warden Meligan's letter approving visitation. Defendants do not

24  attempt to explain why Director Crawford did not respond to this letter. Therefore, any "error"

25  that occurred was not the fault of plaintiffs. Defendants claim that they learned "adverse

26  information" about Ms. Deeds on May 23, 2006, which caused them to suspend her visiting

27  privileges, specifically that she was a former employee. The fact that Ms. Deeds was a former

28  employee does not appear to the court to be the type of "adverse information" that AR 719

1   envisioned, as this information was disclosed when Ms. Deeds applied for visitation, and she was

2   granted privileges in spite of it. It is also unclear why defendants did not notice that a former

3   employee was permitted to visit for five years. Defendants state that it was widely known that Ms.

4   Deeds was a former employee, but fail to explain why she was allowed to visit for five years.

5   Plaintiffs also state that NDOC's policy is not to allow former employees to visit with inmates.

6   However, AR 719 does not reflect this policy. Rather, it appears to reflect the exact opposite

7   policy, since it creates a method whereby former employees can request and be granted visiting

8   privileges. Further, this policy was never disseminated to prison employees. It seems bizarre to

9   enact a policy with regard to who may visit, but not inform the visiting officers about this policy.

10  However, because the court has already found that AR 719 does not give plaintiffs a state-created

11  liberty interest in visitation, defendants have not violated plaintiffs' substantive due process

12  rights.

13         The court also finds that defendants' policy of disallowing visits between inmates and

14  former employees meets the *Turner* test and is reasonably related to a legitimate penological

15  interest. First, this policy does have a valid, rational connection to safety and security. Defendants

16  contend that former employees can be compromised and disclose security measures to inmates.

17  They base this concern in part on a recent inmate escape which occurred after the inmate

18  compromised a former employee (#84, exh. 1BB). Prison officials have a legitimate interest in

19  the safety and security of the institution. Second, plaintiffs have alternative means to exercise their

20  asserted right. Plaintiffs can still communicate by telephone and letter. The court realizes this may

21  not be ideal, but it is a sufficient alternative. *Overton*, 539 U.S. at 135. Third, defendants have

22  demonstrated that allowing visitation between inmates and former employees would have a

23  significant impact on prison staff, inmates, allocation of prison resources, and safety of visitors

24  (#84, p. 15). Defendants state that allowing visits "would have a significant impact on prevention

25  of security breaches that might risk danger to the correctional staff, other inmates, and the public."

26  *Id*. Plaintiffs have not demonstrated that such an impact would not occur. Fourth, plaintiffs have

27  not demonstrated that there are ready alternatives to the regulation. Therefore, plaintiffs have not

28  demonstrated that the suspension of visitation between inmates and former employees fails to

1   meet legitimate penological interests.

2            **(d)          Qualified Immunity**

3            Defendants contend that even if plaintiffs had some right to visit, Defendant Helling

4   would nonetheless be entitled to qualified immunity (#84, p. 17).   The defense of qualified

5   immunity protects state officials sued in their individual capacities unless the conduct complained

6   of violates a clearly established constitutional or statutory right of which a reasonable person

7   would have known. *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001).  A qualified

8   immunity analysis begins with a threshold question of whether, based upon facts taken in the light

9   most favorable to the party asserting the injury and in light of such clearly established law, an

10  official's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If

11  no constitutional right was violated, the court need not inquire further.  *Id*.  However, if a

12  constitutional violation occurred, the court's second inquiry is whether the official could

13  nevertheless have reasonably, but mistakenly, believed that his or her conduct did not violate a

14  clearly established constitutional right.  *Id*.  Qualified immunity protects "all but the plainly

15  incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 355, 341

16  (1986).

17          A qualified immunity analysis involves three steps: (1) the identification of the right

18  allegedly violated; (2) a determination of whether that right was "clearly established" at the time

19  of the incident such that a reasonable officer would know the constitutional parameters; and (3)

20  the determination of whether a reasonable officer could have believed lawful the particular

21  conduct at issue.  *Sloman v. Tadlock*, 21 F.3d 1462, 1467 (9th Cir. 1994).

22          Plaintiffs allege that defendants violated their Fourteenth Amendment substantive due

23  process rights by arbitrarily denying them visitation. As set forth in the previous discussion, the

24  court has concluded that Mr. Deeds does not have a constitutional right to visitation with respect

25  to particular persons based on Supreme Court and Ninth Circuit precedent. Further, even if the

26  court is wrong and plaintiffs have a cognizable constitutional claim, any right they had was not

27  clearly established. Many courts have held that inmates do not have a substantive due process

28  right to visitation with a particular person. Therefore, plaintiffs do not have a clearly established

13

1   right to visitation. As such, defendant Helling is entitled to qualified immunity on plaintiffs'

2   visitation claims. Defendants' motion for summary judgment (#84) is granted as to counts I, III,

3   and IV, and plaintiffs' motion for summary judgment re: suspension of visitation (#71) is denied.

4               **2.          Count II - Retaliation**

5          Plaintiffs allege that defendant Helling suspended plaintiffs' visitation privileges in

6   retaliation because Mr. Deeds previously filed a civil rights action against Helling and other

7   prison staff (#26, p. 6). Defendants claim that they are entitled to summary judgment on count II

8   because plaintiffs "fail to demonstrate a nexus between the suspension of Plaintiff's visitation and

9   the existence of the 2003 case, the settlement conference, the prison guard allegation, or the

10  March 7, 2006 incident" (#84, p. 20). Additionally, plaintiffs have not demonstrated the absence

11  of a legitimate penological goal served by the suspension of visitation. *Id*., p. 21. Further,

12  defendant Helling is entitled to qualified immunity. *Id*. p. 21-22. Plaintiffs respond that they have

13  shown circumstantial evidence of retaliation. They state that defendant Helling knew of the

14  previous lawsuit Mr. Deeds filed against him and other prison officials because he was present

15  at a settlement conference (#104, p. 20). This knowledge is evidence of retaliation because

16  defendant Helling "suspended [plaintiffs'] visitation based on the report of C/O Barats," another

17  defendant in the previous suit. *Id*. Defendants reply that plaintiffs have not demonstrated that Mr.

18  Deeds's naming defendant Helling as a defendant in a previous suit, *Deeds v. Bayer*, caused

19  defendant Helling to retaliate against Mr. Deeds (#96, p. 11). Additionally, plaintiffs failed to

20  respond to defendants' qualified immunity argument, which results in plaintiffs' "concession that

21  defendant Helling is entitled to qualified immunity." *Id*. p. 12.

22          Prisoners have a right to meaningful access to the courts, and prison authorities may not

23  penalize or retaliate against an inmate for exercising this right.  *Bradley v. Hall*, 64 F.3d 1276,

24  1279 (9th Cir. 1995).  Prison officials may be sued under Section 1983 for retaliating against a

25  prisoner for exercising his or her constitutional rights. *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4

26  (9th Cir. 1995). A retaliation claim involves five elements: "(1) An assertion that a state actor took

27  some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and

28  that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action

14

1    did not advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th

2    Cir. 2004).

3           Retaliation claims must be evaluated in light of the deference accorded to prison officials.

4    *Id*. at 807. The inmate bears the burden of pleading and proving the absence of legitimate

5    correctional goals for the alleged retaliatory action. *Id*. at 806; *Bruce v. Ylst*, 351 F.3d 1283, 1288

6    (9th Cir. 2003). The Ninth Circuit has recognized that "timing can properly be considered as

7    circumstantial evidence of retaliatory intent." *Pratt*, 65 F.3d at 808.

8           Even viewing the evidence in the light most favorable to Mr. Deeds, he has presented no

9    conclusive evidence that defendant Helling retaliated against him. Defendant Helling states that

10   he did not suspend plaintiffs' visitation privileges based on a settlement conference in another

11   case, and plaintiffs have pointed to no evidence that demonstrates otherwise. Further, defendant

12   Helling states that he did not recall any specific details about the case or whether he was a named

13   defendant in *Deeds v. Bayer*. *Id*. p. 20-21, exh. 1AA. Plaintiffs have presented no evidence to

14   contest that defendant Helling did not recall he was a named defendant or details of Mr. Deeds's

15   previous lawsuit. The fact that Mr. Deeds filed numerous lawsuits against NDOC officials,

16   naming defendant Helling in one of these suits, is not sufficient evidence of retaliation.

17   Additionally, as discussed previously with regard to plaintiffs' visitation claims, plaintiffs have

18   not demonstrated that the suspension of visitation does not advance a legitimate correctional goal.

19   Because Mr. Deeds has not introduced evidence sufficient to raise any issues of fact, defendants'

20   motion for summary judgment is granted as to count II.

21          **3.      Count V - Deprivation of Personal Property**

22          Mr. Deeds alleges that on February 26, 2006, defendant Peabody confiscated his personal

23   property, pursuant to AR 711, which disallows inmate possession of excessive personal property

24   (#26, p. 9). Mr. Deeds claims that his property was confiscated pursuant to defendant Helling's

25   policy. *Id*. Mr. Deeds also states that his laundry and headphones were stolen by other inmates

26   because of prison policies. *Id*. Through the alleged conduct, Mr. Deeds claims that defendants

27   have violated his "Fourteenth Amendment prohibition of unlawful deprivation of personal

28   property in authorized manner." *Id*.

1    Defendants' position is that they did not violate Mr. Deeds's Fourteenth Amendment

2    rights because he does not have a liberty interest in the possession of excessive property (#84, p.

3    23-24). Defendants claim that defendant Peabody "properly followed AR 711 in confiscated

4    plaintiff's personal property....[and] the enforcement of AR 711 does not create an 'atypical,

5    significant' hardship on inmates compared to the normal incidents of prison life." *Id*. p. 27.

6    Defendants also argue that Mr. Deeds fails to allege that defendant Helling had any personal

7    involvement in the deprivation of plaintiff's personal property, as required by section 1983. *Id*.

8    p. 28. Defendants also assert that they are entitled to qualified immunity. *Id*. p. 28-29.

9    Plaintiffs respond that defendant "Peabody manipulated procedures to deny Deeds a

10    hearing, and by not charging him with being in possession of contraband did exceed his

11    discretion" (#104, p. 22). Plaintiffs claim that defendant Peabody placed Mr. Deeds's appliances

12    into his storage boxes, which is why he appeared to have excess property. *Id*. Further, defendant

13    Peabody completed "an unauthorized property form in lieu of conducting a 'full inventory.'" *Id*.

14    Defendant Peabody also filed a notice of charges that was "demonstrably false." *Id*. Plaintiffs

15    claim that the deprivation of Mr. Deeds's property was a "dramatic departure from the conditions

16    of confinement." *Id*. p. 23. Further, defendant Helling's policies allow property to be confiscated

17    and stolen. *Id*.

18    Defendants reply that plaintiffs fail to demonstrate the creation of a liberty interest

19    regarding possession of excess property (#96, p. 13). Further, "even if plaintiff could demonstrate

20    a protected liberty interest, which he cannot, he cannot demonstrate a liberty interest which 'will

21    be generally limited to freedom from restraint which...impose atypical and significant hardship

22    on the inmate in relation to the ordinary incidents of prison life.'" *Id*. Moreover, Mr. Deeds has

23    not demonstrated a deprivation of procedural due process as he was able to choose from four

24    options in an unauthorized property notification and use the inmate grievance system. *Id*. p. 15.

25    Defendants also contend that plaintiffs' allegations with regard to no limit being placed on the

26    amount of property Mr. Deeds is allowed to purchase at the inmate canteen in order to increase

27    profits for the prison are irrelevant. *Id*. p. 14-15. Defendants again argue that defendant Helling

28    was not personally involved in confiscating plaintiff's property and that both defendants are

16

1  entitled to qualified immunity. *Id*. p. 17-18.

2          **(a)**        **Nevada Revised Statutes § 212.010(2) and 209.239**

3          Nevada Revised Statute § 212.010(2) reads: "A conviction of crime does not work a

4  forfeiture of any property, real or personal, or of any right or interest therein unless otherwise

5  specifically authorized by statute." Nev. Rev. Stat. § 209.239 specifically authorizes the warden

6  of each institution to adopt regulations regarding personal property of inmates. It states in full:

7        Subject to the approval of the Director, the warden of each institution and
      manager of each facility shall adopt and issue a written policy statement

8        regulating the personal property which an offender may retain in his
      possession, including, but not limited to: (1) Procedures necessary to

9        ensure that offenders are permitted to retain reasonable amounts of
      personal property, consistent with security and proper functioning of the

10        institution or facility. (2) Necessary procedures for the careful handling
      and secure storage of the personal property of an offender.

11
        **(b)**        **AR 711 and IP 7.00**

12          AR 711 governs an inmate's right to possession of personal property (#84, exh. 2A).

13  Among others, the AR states as its purposes: "To prescribe limitations for the volume and type

14  of personal property to be maintained in an inmate's possession," and "to limit the amount of

15  personal property, which may be acquired and retained consistent with the available space, health,

16  sanitation, and security needs." AR 711, p. 1-2 (#84, exh. 2A). The AR allows inmates to possess

17  property that will fit into one approved footlocker or one fire retardant box that does not exceed

18  24"x18"x18". Inmates may also posses three appliances that do not need to fit in the boxes. *Id*.,

19  AR 711.01.1.4.1. The AR states that "inmates may not accumulate excess property that cannot

20  be properly stored." *Id*. Further, "[p]roperty limitations will be enforced any time movement and

21  inventory of property is required, i.e., placed in more restrictive housing, transferred, etc. It will

22  be the inmate's responsibility to dispose of any excess property per AR 711." *Id*. AR

23  711.01.1.4.2. AR 711.08 lists all authorized property and sets forth which types of property must

24  be purchased through the inmate canteen (e.g. appliances). *Id*. AR 711.08. The final section of

25  AR 711.08 states: "**INMATES PURCHASE ALL ITEMS AT THEIR OWN RISK. Upon**

26  **transfer to another institution, inmates will be required to dispose of all property not**

27  **permitted at the receiving location**. *Id*. AR 711.08.1.12 (emphasis in original).

28

1    IP 7.00 also governs an inmate's possession of personal property. It sets forth "specific

2    rules unique to the Northern Nevada Correctional Center" and indicates "the amounts and variety

3    of personal property permitted and the safe keeping, disposal and storage of inmate personal

4    property." *Id*., exh. 2C, IP 7.00. The IP sets out the type of property inmates are allowed to

5    possess. IP 7.00©. It also describes how inmates' property should be handled during housing

6    changes. IP 7.00(D). Specifically, the IP states that "when an inmate is placed in more restrictive

7    housing or otherwise prevented from returning to their housing assignment to control their

8    property, staff shall secure the property as soon as reasonably possible." *Id*. § (D)(3). Further, the

9    IP specifies that "inmates purchase all items at their own risk. Upon transfer, restrictions may be

10   place[d] on items not permitted due to custody, location, and property limitations. *Id*. § (D)(3)(g).

11                        **(c)      Analysis**

12        Even viewing the evidence in the light most favorable to Mr. Deeds, he has not

13   demonstrated that defendants violated his due process rights. AR 711 does not create a liberty

14   interest that is protected by the due process clause. The court has set out the law related to state-

15   created liberty interests in its discussion of visitation privileges above, and it will not repeat the

16   law here. The enforcement of AR 711 and confiscation of excess personal property does not

17   create an atypical hardship on inmates in relation to the ordinary incidents of prison life. The

18   evidence presented demonstrates that defendant Peabody followed the procedures set out in AR

19   711 when he confiscated plaintiff's excess property. Defendant Peabody filed an "Unauthorized

20   Property Notification" form listing plaintiff's property that did not fit in his "box or tub" (#84,

21   exh. 2G). AR 711 does not require an officer to file a notice of charges against an inmate for

22   possession of inmate property. Rather, an inmate is given four options of what he wants the prison

23   to do with his excess property. *Id*., *see also* AR 711.02.1.2.1. Mr. Deeds chose to appeal the

24   unauthorized property notification and was given the opportunity to appeal through the inmate

25   grievance process (#84, exh. 2I-2O).  Defendants responded to plaintiff's grievances. Mr. Deeds

26   does not have a right to unlimited property. Nevada Revised Statute § 209.239 gives prison

27   officials the authority to impose regulations that limit an inmate's possession of property to a

28   reasonable amount, consistent with security and functioning of an institution. Nev. Rev. Stat. §

209.239(1). NDOC created AR 711 pursuant on this statute. Defendants did not violate Mr. Deeds's due process rights when they confiscated his excess property pursuant to AR 711. Therefore, the court grants defendants' motion for summary judgment (#84) as to count V.

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that:

1.  There are no issues of fact as to whether defendant Helling violated plaintiffs' substantive due process rights when he suspended their visitation privileges. Plaintiffs do not have a substantive due process right to unfettered visitation and they have failed to demonstrate that defendants' policy of not allowing former employees to visit inmates is not reasonably related to a legitimate penological interest. Further, defendant Helling is entitled to qualified immunity;

2.  There are no issues of fact as to whether defendant Helling suspended plaintiffs visitation privileges in retaliation for Mr. Deeds's having previously filed a lawsuit against him. Plaintiffs have presented no evidence of retaliatory intent;

3.  There are no issues of fact as to whether defendants violated Mr. Deeds's due process rights when they confiscated his personal property pursuant to AR 711, because plaintiff does not have a liberty interest in possession of unlimited property and defendants properly followed the provisions of AR 711 when they confiscated plaintiff's excess property;

As such, the court recommends that defendants' motion for summary judgment (#84) be **GRANTED** as to all counts, and plaintiff's motion for summary judgment re: visitation (#71) be **DENIED**.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)© and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

*///*

*///*

19

1

**IV.  RECOMMENDATION**

2

      **IT IS THEREFORE RECOMMENDED** that defendants' motion for summary

3

judgment (#84) be **GRANTED** as to all counts, and plaintiff's motion for summary judgment re:

4

visitation (#71) be **DENIED**.

5

      **DATED:** February 19, 2009.

6

7

                           _____

8

                           **UNITED STATES MAGISTRATE JUDGE**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28